IN THE

TENTH COURT OF
APPEALS




 
 
 
 
 
 
 


 



No. 10-06-00308-CV

 

Jim Tranum,

                                                                                    Appellant

 v.

 

David Broadway,

                                                                                    Appellee

 

 

 



From the 52nd
District Court

Coryell County, Texas

Trial Court No. COT-01-33,453

 



Opinion



 

            A jury found Jim Tranum liable for
malicious prosecution and slander against David Broadway and awarded mental
anguish, reputation, and exemplary damages to Broadway.  Tranum appeals, arguing
that: (1) the evidence is legally and factually insufficient to support
malicious prosecution, slander, mental anguish damages, reputation damages, and
exemplary damages; (2) the jury’s award of exemplary damages is
unconstitutional; (3) exemplary damages were not tied to a cause of action; (4)
Broadway received a double-recovery of mental anguish damages; (5) in the alternative,
the exemplary damages award should be remitted if not stricken; (6) in the
alternative, the award of mental anguish damages should be remitted if not
stricken; and (7) the trial court abused its discretion by striking expert
testimony.  We modify the judgment
and affirm the judgment as modified.

Factual
Background

Tranum employed Broadway as the new
car sales manager at Tranum Buick Pontiac GMC in Temple.  Broadway later became
the general manager for Tranum Ford-Mercury in his hometown of Gatesville.  He
received monthly compensation, a year-end bonus of twenty percent net profit,
ten percent of all credit life insurance, and twenty percent of the proceeds
from a car wash owned by Tranum.  He used his annual bonuses to purchase stock
in the dealership.  Broadway and B.J. Shaw, the dealership’s bookkeeper,
prepared the dealership’s monthly financial statements.  Tranum reviewed these
statements and at the end of each year, he and the board of directors reviewed
the dealership’s financial records and awarded bonuses.  Tranum and his three
daughters also received bonuses.

At some point, the dealership began experiencing
cash flow problems.  Tranum wanted to buy another dealership, but Ford Motor Company
had expressed concern about Tranum Ford’s “cash position.”  Broadway and Tranum
had discussed the dealership’s financial position.  According to Broadway, Ford
expected the dealership to be “in the black,” and Tranum instructed Broadway to
“fix it.”  Broadway knew how Tranum Buick had handled the problem and decided
to use this same practice.  He would take
the “next two or three days’ or four days’ deposits, post them in the previous
month so that it shows that you’re in the positive in the bank, send your
financial statement off electronically, [and] move the cash back where it
belongs.”  Tranum did not expressly instruct Broadway to use this practice and
Broadway did not tell Tranum how he “fix[ed]” the problem.  Eventually,
a check to Ford Motor
Credit bounced due to insufficient funds.  Tranum contacted Broadway who informed
Tranum that the dealership needed money and had for a “long time.”  Tranum
instructed Broadway to “grow up.”  Unable to “take the stress anymore,” Broadway
left the dealership that day, but later returned to clean out his office and deliver
his resignation letter to Tranum’s daughter.  Tranum subsequently invested about $350,000 to “keep the doors open.”

A few days later, Shaw issued a written statement
wherein she claimed that Broadway instructed her to reverse
transactions reflecting a loss, not show overdraft charges on the financial statements,
and alter the statements to show a profit by increasing costs, offsetting
expenses, and performing transactions to “bring his bottom line up.”  Broadway had assured Shaw that Tranum was aware
of these practices and that Tranum Buick also used these practices.  Shaw wrote
that she once attempted to quit when she discovered that someone had gone
through her office, misplacing and disposing of records, but Broadway
threatened to “blame everything” on Shaw.  Broadway told Shaw to follow his
instructions or she would lose her job and that Tranum would “stand behind him.” 
Shaw stated that Broadway did not care if she was unable to balance the books.

According to several witnesses, Tranum began
accusing Broadway of theft, embezzlement, and misappropriation.  Broadway sued
Tranum for slander and slander per se.  Tranum’s accountant, Steve
Niemeier, subsequently issued a report after examining the dealership’s
financial records at Tranum’s request.  Niemeier found that: (1) certain
accounts were not reconciled to the general ledger during the applicable dates;
(2) operating expenses were “inappropriately deferred as increases to inventory”;
(3) “financial statement items” were “increased to a value that exceeded what
was considered a reasonable balance”; (4) “the Dealership had delayed reporting
sales activity in order to delay required loan payments”; (5) “parts inventory”
was “significantly overstated”; (6) “collection procedures significantly reduced
the claims receivable account”; (7) $13,789.09 in “[i]ndividual customer
accounts” were “doubtful for future collection”; (8) $9,050 in operating
expenses had been “added to inventory”; (9) “retained earnings” were “reduced
to a deficit balance;” (10) Broadway charged $10,232.57 in personal expenses to
the dealership; and (11) Broadway received $82,091 in bonuses as a result of
the above transactions.

Tranum delivered Shaw’s statement and
Neimeier’s report to Coryell County District Attorney Riley Simpson.  Bruce
Beals, a legal assistant with the district attorney’s office, reviewed these
documents and prepared a memorandum concluding that Broadway: (1) “committed a
theft by deception”; (2) “intentionally misrepresented the amount of annual net
profit of Tranum Ford-Mercury in order to obtain a yearly bonus, thereby unlawful[ly]
appropriating funds”; and (3) received bonuses in excess of $20,000, but less
than $100,000.  Beals recommended that an indictment be prepared charging
Broadway with “Theft over $20,000, but less than $100,000.”  Simpson presented the
indictment to the grand jury, which returned a “no bill.”  Broadway then amended
his lawsuit to allege malicious prosecution.[1] 


At trial, Tranum admitted that Broadway advised
him of the dealership’s financial problems, but testified that he did not
perceive a problem in light of financial statements reflecting a positive cash
flow.  He denied knowing that Broadway was altering financial statements until
after Broadway resigned and Shaw informed him of the situation.  However, at her deposition, Shaw testified that Tranum
instructed her to write the statement under threats that she would go to jail
and have her children taken away.  Shaw was afraid and wrote what she thought
Tranum wanted to hear.  Tranum denied threatening Shaw and accused Shaw of
lying.

Tranum testified that he would not have approved
even if he had known of Broadway’s actions.  He denied altering the books at his other dealerships or
instructing Broadway to do so, but admitted lying to General Motors to conceal a
negative cash balance and submitting documents that misrepresented the “true
state of the bank accounts.”  He testified that documents were sometimes
altered, probably at his direction, to show that the dealership had more money
in the bank, but did not misstate assets, liabilities, expenses, income, or
losses.  He would have no complaints had Broadway used these practices.  He
claimed that the “bottom line,” “net worth of the financial statement, the
assets, [and] the liabilities” never changed.      

Dorothy Haddox, former bookkeeper for Tranum Buick,
testified that Tranum never instructed her to change or alter an accurate
financial statement.  Haddox testified that General Motors did not like to see
statements showing a negative cash balance.  Therefore, Tranum instructed
Haddox not to show a negative cash balance on the statements and reviewed
statements thoroughly to ensure that such a balance was not shown.  Haddox
explained that she would increase the account balance and decrease the
inventory, but the bottom line never changed.  She corrected the statements
after submitting them to General Motors.  Haddox denied changing statements to
obtain a “better bottom line,” transferring items between expense and asset
accounts, deferring operating expenses as increases to inventory, overstating
accounts receivable or parts inventory, delaying reports of sales activity, or
failing to record operating expenses, payments, loans, checks, or bank
charges.  She did not recall using “bad accounting practices” or being asked to
do so.

Jack Ralston, general sales manager for Tranum
Auto Group, testified that Broadway had contacted him and admitted his failure
to timely pay off vehicles.  Broadway was “concerned” and “distraught,” could
not pay the amount owed to Ford Motor Credit, had not yet told Tranum that he
could not pay Ford, and expected to lose his job.  Broadway did not admit to
any other improprieties.  He had never asked Ralston about inappropriate
accounting practices.  Ralston was unaware of any such practices at Tranum Auto
and testified that Tranum never failed to timely pay invoices, post expenses to
proper accounts, write off uncollectible accounts, or adjust inventory accounts
to their proper value.  Ralston visited Tranum Ford and found some evidence
that dealership funds were used to pay Broadway’s personal expenses.  Although
he did not “dig too deep,” Ralston found no evidence of any other problems.

Tranum denied knowing or approving of Broadway’s
use of dealership funds to pay personal expenses.  Broadway testified that he
used his personal credit card to make purchases for the dealership, including a
car wash owned by Tranum.  Broadway was not reimbursed for these expenses, but
rather gave the bills to the bookkeeper.  Broadway further testified that the
dealership paid the dry cleaning bill for his work clothes and also paid his personal
expenses during a “good year,” which Tranum knew.  Tranum denied allowing
managers, employees, or family members to use company funds to pay personal
expenses.  Ralston confirmed this fact, but also testified that he had used his
personal credit card to make purchases for Tranum Auto and submitted receipts
to the bookkeeper for reimbursement.  Haddox testified that Tranum Buick may
have paid some personal expenses, but nothing major.

The jury found that: (1) Tranum
maliciously prosecuted Broadway, proximately causing damage to Broadway’s name
and reputation in the amount of $75,000 and emotional distress and mental
anguish in the amount of $500,000; (2) Tranum slandered Broadway, proximately
causing Broadway to suffer emotional distress and mental anguish in the amount
of $250,000; (3) Tranum acted with malice, entitling Broadway to exemplary
damages in the amount of $750,000; and (4) Broadway breached his fiduciary duty
to Tranum Ford, proximately causing $3,000 in damages.[2]

LEGAL AND FACTUAL SUFFICIENCY

            In his first issue, Tranum argues that
the evidence is legally and factually insufficient to support: (1) malicious prosecution;
(2) slander; and (3) damages.   

                                                         Standards
of Review

A legal sufficiency challenge requires
consideration of “whether the evidence at trial would enable reasonable and
fair-minded people to reach the verdict under review.”  City of Keller v. Wilson, 168 S.W.3d 802, 827 (Tex. 2005).  We “must credit favorable evidence
if reasonable jurors could, and disregard contrary evidence unless reasonable
jurors could not.”  Id.

A factual sufficiency challenge to
issues on which the appellant did not bear the burden of proof requires us to
“consider and weigh all of the evidence.”  Checker Bag Co. v. Washington, 27 S.W.3d 625, 633 (Tex. App.—Waco
2000, pet. denied). 
We may not pass upon the witnesses’ credibility or substitute our judgment for
that of the jury, even if the evidence would clearly support a different
result.  Id.  We will reverse the “verdict only if it is so contrary to
the overwhelming weight of the evidence that the verdict is clearly wrong and
unjust.”  Id.  Reversal can occur because the finding was based on weak
or insufficient evidence or because the proponent’s proof, although adequate if
taken alone, is overwhelmed by the opponent’s contrary proof.  Id.

Malicious Prosecution

 

            The elements of malicious prosecution are:
(1) commencement of a criminal prosecution against the plaintiff; (2) the
defendant’s initiation or procurement of that prosecution; (3) termination of the
prosecution in the plaintiff’s favor; (4) the plaintiff’s innocence; (5) lack
of probable cause to initiate the prosecution; (6) malice in filing the charge;
and (7) damage to the plaintiff.  See Kroger Tex. Ltd. P’ship v. Suberu, 216 S.W.3d 788, 793 n.3 (Tex. 2006).  Tranum challenges elements two, four, five and six.  We will address these
elements in the order addressed by Tranum.       

Innocence 

To
prevail on a malicious prosecution claim, a plaintiff must prove his innocence
of the crime charged.  See Kroger, 216 S.W.3d at 792.  Broadway was charged with
theft of more than $20,000 but less that $100,000.  See Tex. Pen. Code Ann. 31.03(a), (e)(5) (Vernon Supp. 2007).  

Because the jury found that Broadway breached his
fiduciary duty to Tranum Ford, Tranum argues that the same evidence supporting this
finding also supports a finding of Broadway’s guilt: (1) Niemeier concluded
that Broadway received $82,091 in bonuses as a result of altering the financial
statements; (2) Broadway admitted altering the financial statements to
inaccurately reflect a positive cash flow; (3) Broadway admitted that Tranum
did not instruct him to use this practice or provide any “direction” as to how
to “fix” the problem; (4) Broadway did not tell Tranum that he altered the
financial statements; (5) Shaw stated that Broadway instructed her to engage in
improper accounting practices; (6) Broadway charged approximately $10,000 in
personal expenses to the dealership; and (7) Broadway used his bonuses to
purchase stock in the dealership in order to ensure its “paper profitability”
and guarantee “a return on his investment by rigging the books to show paper
profits.”[3] 
Broadway responds that he acted with Tranum’s knowledge or “tacit
instruction.”  A “crucial element of theft is the deprivation of property
from the rightful owner, without the owner’s consent.”  Stewart v. State, 44 S.W.3d 582, 589 (Tex. Crim. App. 2001);
see Tex. Pen. Code Ann. 31.03(b)(1) (Vernon Supp. 2007).  If Broadway acted with Tranum’s consent, he
cannot be guilty of theft.

The record contains some evidence that this
element of theft was not met.  Neither Ford nor General Motors wanted to see financial
documents reflecting a negative cash balance.  Neither did Tranum.  Tranum
thoroughly examined Tranum Buick’s financial documents to ensure that such a
balance was not shown and also reviewed the financial documents for Tranum Ford
both monthly and annually.  He and Haddox had altered the financial statements
at Tranum Buick to inaccurately reflect a positive cash flow.  Haddox testified
that whenever a financial statement showed a negative cash balance, she was
instructed to correct the statement.  Having worked for Tranum Buick, Broadway
was apparently aware of this practice and knew that Tranum did not like to see
a negative cash balance.  When Tranum similarly instructed Broadway to “fix” the
problem, Broadway responded by following the same practice used at Tranum Buick
to “fix” a similar problem: altering the financial statements to inaccurately reflect
a positive cash flow.  Regardless of whether Broadway and Tranum used different
types of transactions to achieve this goal, the result is still the same.

The circumstances surrounding Shaw’s written
statement also indicate that Tranum knew about the accounting practices at
Tranum Ford.  Broadway told Shaw that other dealerships, particularly Tranum
Buick, had used the same types of practices and that Tranum knew about these
transactions.  Although Shaw later expressed doubt as to the truth of her written
statement, she also testified that, to
the best of her knowledge, she believed her statement to be true at the time it
was written.  The jury bore the burden
of reconciling any conflicts between Shaw’s written statement and her
subsequent testimony, as well as deciding what facts to believe.  See City of Keller, 168 S.W.3d at 820.  That
Tranum may have threatened Shaw into preparing her statement could also lead
the jury to question Tranum’s reasons for threatening Shaw, and ultimately, his
lack of knowledge or involvement in Broadway’s actions.

As the “sole judge of the credibility of the
witnesses and the weight to give their testimony,” the jury could reasonably
conclude that Tranum was aware of and possibly orchestrated Broadway’s
actions.  Golden Eagle
Archery, Inc. v. Jackson, 116 S.W.3d 757, 761 (Tex.
2003).  The jury was entitled to disbelieve Tranum’s
testimony to the contrary.  See City
of Keller, 168 S.W.3d at 819; see
also Hinkle v. Hinkle, 223 S.W.3d 773, 778 (Tex. App.—Dallas 2007, no
pet.).  The jury’s findings that both Tranum and Broadway breached their
fiduciary duties to Tranum Ford seem to indicate that the jury believed that
Broadway was not acting on his own.  Accordingly, the jury could reasonably
conclude that Broadway was innocent of the theft charges brought against him
because he did not act without Tranum’s consent, an essential element to the
offense of theft.  See Tex. Pen. Code Ann. 31.03(b)(1); see
also
Stewart, 44 S.W.3d at 589.

Probable Cause 

Under the probable cause element, we
consider “whether a reasonable person would believe that a crime had been
committed given the facts as the complainant honestly and reasonably believed
them to be before the criminal proceedings were instituted.”  Richey v. Brookshire Grocery Co., 952 S.W.2d 515, 517 (Tex. 1997).  A presumption exists that
the “defendant acted reasonably and had probable cause to initiate criminal
proceedings.”  Kroger, 216 S.W.3d at 793.  “To rebut this presumption, the
plaintiff must produce evidence that the motives, grounds, beliefs, or other
information upon which the defendant acted did not constitute probable cause.” 
 Id.  We consider “only whether the complainant reasonably believed
that the elements of a crime had been committed based on the information
available to the complainant before criminal proceedings began.”  Richey, 952 S.W.2d at 519.  When the facts are disputed, the jury
“must weigh evidence and resolve conflicts to determine if probable cause
exists, as a mixed question of law and fact.”  Id. at 518.  When the facts are undisputed, “probable cause
is a question of law” for the court.  Id.

            Based on Broadway’s prompt
resignation and alleged confiscation of a company computer, Shaw’s written
statement, Niemeier’s report, and Broadway’s statements to Ralston, Tranum
argues that he reasonably and honestly believed that Broadway was guilty of
committing a crime.  He relies on Kroger to support his position.  In Kroger,
Theresa Suberu went to the Kroger pharmacy
to purchase medication.  See Kroger, 216 S.W.3d at 791.  Suberu told the pharmacy technician that she was
going to retrieve some extra cash from her vehicle.  Id.  The manager
stopped Suberu from leaving the store.  Id.  The manager claimed that Suberu
was “pushing a grocery cart full of unsacked goods.”  Id.  Suberu denied
using a cart that day.  See id.  Other Kroger employees also saw Suberu
pushing a cart.  Id.  Suberu explained that she was going to retrieve
money from her vehicle.  Id. at 792.  No one spoke to the technician to
confirm Suberu’s story.  Id.  Suberu was arrested, acquitted of
misdemeanor theft, and later filed suit for malicious prosecution.  Id.  The Supreme Court found Suberu’s testimony legally insufficient to rebut the
presumption of probable cause because “Suberu’s testimony does no more than
create a surmise or suspicion that Kroger did not believe she was guilty of
shoplifting” and “merely invites speculation that Kroger framed her and lied to
the police.”  Id. at 795.     

            Broadway points to other
pieces of evidence, in addition to his testimony, to negate probable cause.  First,
Broadway contends that the “chain of events” in this case is “unsettlingly
similar” to that of another of Tranum’s business associates, Tom Jorman.  Jorman
and Tranum were partners in a dealership.  After Jorman sold his interest in
the dealership to Tranum, Tranum accused Jorman of stealing money from the
dealership.  Jorman was charged with theft and Tranum filed a civil suit
against Jorman.  Both cases were dismissed.  Tranum testified that the claims
against Jorman involved the use of dealership funds to pay for Jorman’s Corvette
and note payments on a piece of property.  Jorman admitted that the dealership had been reimbursed for some funds that
were diverted to him, but denied
stealing money from the dealership. Tranum admitted that he wanted Jorman to be
prosecuted, that Niemeier’s accounting firm handled the audit, and that he
provided information to the district attorney.  

Second, Broadway contends that Tranum
“use[s] his power to intimidate employees,” in that he would have no reason to
threaten Shaw unless he expected that “her non-coerced and truthful statements
would not benefit his scheme against David [Broadway].”  Third, Broadway
contends that Tranum possessed motive to have Broadway prosecuted because Tranum
pursued a criminal prosecution against Broadway only after he had been sued by
Broadway for slander and slander per se, and Tranum was seeking to sell
Tranum Ford around the same time as the grand jury investigation.  Broadway
argues that theft allegations were a way to get rid of Broadway so that Tranum
could take Broadway’s interest in the dealership “without just compensation” and
prevent Ford from discovering Tranum’s involvement in Broadway’s efforts to
mislead Ford.

We cannot say that the facts
surrounding Tranum’s decision to prosecute are undisputed or that Broadway’s
testimony is unsupported by other evidence; thus, the jury bore the
responsibility of determining the issue of probable cause.  See Richey, 952 S.W.2d at 518.  The jury could recognize
similarities between the Jorman and Broadway cases and believe that Tranum had
reasons for threatening Shaw.  Moreover, as we held above, the jury could
reasonably conclude that Tranum was aware of Broadway’s actions and that Tranum
had a motive for pursuing criminal charges against Broadway.  The record
contains evidence to support a finding that Tranum possessed a private motive
to harm Broadway and thus acted on something other than a reasonable and honest
belief that Broadway had committed theft.  See Kroger,
216 S.W.3d at 795.  Accordingly, the record in this case does not merely “invite speculation,” but
creates more than a mere “surmise or
suspicion” that Tranum could not reasonably and honestly
believe that Broadway had committed theft.

Initiation or Procurement 

A person initiates a criminal
prosecution by filing “formal charges against [the] plaintiff.”  Browning-Ferris Indus., Inc. v. Lieck, 881 S.W.2d 288, 293 (Tex. 1994). 
“A person procures a criminal prosecution if his actions were enough to cause
the prosecution, and but for his actions the prosecution would not have
occurred.”  Id.  “A person does not procure a criminal prosecution when
the decision whether to prosecute is left to the discretion of another,”
“unless the person provides information which he knows is false.”  Id.  The plaintiff must show that the “prosecutor acted based on the false
information” and the false information must have been material to the decision
to prosecute.  King v. Graham, 126 S.W.3d 75, 78 (Tex. 2003).  “If the decision to prosecute would have been made
with or without the false information, the complainant did not cause the
prosecution by supplying false information.”  Id.

Simpson testified that Tranum informed him of Broadway’s
actions and delivered Neimeier’s report and Shaw’s written statement to
Simpson.  Beals reviewed these documents, interviewed Niemeier, and recommended
that an indictment be prepared charging Broadway with theft.  Simpson testified
that it was his responsibility to decide whether to present the indictment to
the grand jury and that he would not have done so had he believed that probable
cause did not exist.  This testimony suggests that the decision to prosecute
Broadway was entirely left to Simpson’s discretion.  See Lieck, 881 S.W.2d at 293.

Accordingly, to prevail on his
malicious prosecution claim, Broadway bore the burden of showing that Tranum
provided Simpson with material information that he knew to be false and that
Simpson’s decision to prosecute Broadway would not have been made but for this
false information.  See id.; see also King, 126 S.W.3d at 78.  Broadway presents two arguments to satisfy this burden: (1) Tranum
failed to fully disclose relevant facts to Simpson; and (2) Tranum provided
Simpson with false information accusing Broadway of theft.

At trial, Simpson testified that the
following facts would have been relevant to his decision to prosecute Broadway:
(1) that Tranum knew about or directed Broadway’s actions; (2) that Tranum
threatened Shaw, who later expressed doubt as to the truth of her written statement;
and (3) that Tranum knew the outcome of Niemeier’s report prior to its
completion.  Tranum argues that these were mere hypotheticals and that the
information he provided Simpson was not false.  However, we have already determined
that the record contains some evidence that Broadway acted with Tranum’s
knowledge or instruction.  The record also contains evidence that Tranum threatened
Shaw.  Moreover, several witnesses testified that, after Broadway resigned in
January 2001, Tranum began accusing Broadway of theft and embezzlement.  In
March 2001, Broadway sued Tranum for slander and slander per se.  Niemeier
issued his report in April 2001.  That Tranum began lodging accusations against
Broadway prior to completion of Niemeier’s report does not necessarily
establish that Tranum knew, in advance, what specific findings Niemeier would reach,
but certainly suggests that he may have known about Broadway’s actions.   

Although Simpson testified that he had
no reason to believe that Tranum would withhold information, the record does
not suggest that Tranum disclosed the circumstances surrounding Shaw’s
statement or Broadway’s actions.  Simpson testified that Tranum accused
Broadway of committing “theft or
fraud or something along that line.”  Tranum provided Simpson with documents
accusing Broadway of theft.  This information could not be completely accurate
because it omitted one
vital fact: that Broadway acted with Tranum’s consent.  See Richey,
952 S.W.2d at 519 (failure
to “fully and fairly disclose all
material information” is relevant to causation).  Tranum
could not believe that Broadway committed theft if he acted with Tranum’s
consent or that information accusing him of such could be entirely true.  The
jury could infer that he knowingly provided Simpson with misleading information
that falsely accused Broadway of theft.  “[A]n intelligent exercise” of
Simpson’s discretion became impossible upon receipt of this information.  Lieck,
881 S.W.2d at 293-94 (quoting Restatement (Second) of Torts § 653
cmt. g (1977)).

Simpson testified that Broadway would
not have been prosecuted without Tranum’s information.  He further testified that
information that Shaw’s statement was coerced and Broadway acted with Tranum’s
consent would have been relevant to his decision to prosecute Broadway.  Tranum
argues that Simpson did not testify that this information would have changed
his decision.  Neither did Simpson testify that his decision would not
have been different.  The jury could infer that this information was material
and would certainly change Simpson’s decision to present an indictment to the
grand jury, particularly if a crucial element of the crime could not be
established, and that the omission of this information, coupled with Tranum’s
false allegations, caused Broadway to be prosecuted.  See City of Keller, 168 S.W.3d at 821 (“Even if evidence is undisputed, it is
the province of the jury
to draw from
it whatever inferences
they wish, so long as more than one is possible and the jury must not simply guess”); see also In re Bexar County Crim. Dist. Attorney’s Office, 224 S.W.3d 182, 186 (Tex. 2007) (“direct evidence of causation,” such as testimony
from the prosecutor, is not required).

Malice 

Malice constitutes “ill will, evil
motive, or gross indifference or reckless disregard of the rights of others,
and may be established by direct or circumstantial evidence.”  J. C. Penney Co., Inc. v. Ruth, 982 S.W.2d 586, 590 (Tex.
App.—Texarkana 1998, no pet.).  A plaintiff need only prove that the “defendant committed
wrongful acts in reckless disregard of another’s rights and with indifference
as to whether that party would be injured.”  Id.

Tranum presents two arguments in
support of his contention that he did not act with malice.  First, he argues that the jury’s finding that Broadway
breached his fiduciary duty to the dealership is inconsistent with its malice
finding.  “To preserve error that the jury’s findings are inconsistent, the
complaining party must raise an objection in the trial court before the jury is
discharged.”  Kennedy Ship & Repair, L.P. v. Pham, 210 S.W.3d 11, 24
(Tex. App.—Houston [14th Dist.] 2006, no pet.).  Having failed to raise
the issue of an inconsistency or conflict in the jury’s verdict prior to the
jury’s discharge, Tranum has not preserved this issue for appeal.  See id.

Second, Tranum argues that he acted “upon facts he
reasonably believed to be true” and in accordance with his legal right as
“owner of Tranum Ford” to ensure that “employees are not committing wrongful,
even illegal acts.” (citing Closs
v. Goose Creek Consol. Indep. Sch. Dist., 874 S.W.2d 859, 878 (Tex. App.—Texarkana 1994, no pet.)) (“Malice cannot be predicated upon acts which the
actor had a legal right to do”)).  This argument ignores two facts: (1) the
jury found that Tranum breached his fiduciary duty to Tranum Ford; and (2) the
record contains evidence that Tranum
knew Broadway was altering the financial statements, a fact he failed to
disclose to Simpson.  See Richey, 952 S.W.2d at 519 (failure to fully and fairly disclose material information to
the prosecutor is relevant to the issue of malice).  The jury could have reasonably found that Tranum
did not possess probable cause to believe that Broadway committed a crime, and so
the jury could infer malice.  See Thrift v. Hubbard, 974 S.W.2d
70, 80 (Tex. App.—San Antonio 1998, pet. denied) (malice “may be inferred from lack of probable
cause”). 

Moreover, the record contains evidence that Tranum
wanted to harm Broadway.  Tranum told Sherry Sartor, former executive director of the local chamber of
commerce, that Broadway “had stolen money from him” and that he planned to tell
other businesses about Broadway.  According to Sartor, Tranum appeared to want
to hurt Broadway or let people know that Broadway had “done something wrong
towards him.”  Until Tranum approached her, Sartor was unaware that Broadway
was no longer employed with Tranum Ford.  Vernon Farmer, an acquaintance of
both Tranum and Broadway, testified that Tranum said that he was “going to get
him [Broadway], I’m going to prosecute him.”  Broadway had heard that Tranum
was “going to take me down, take me to the police, theft, turn me into the
F.B.I. and do all kind of investigations, and try to ruin my credit and see me
in bankruptcy.”  The jury
could reasonably conclude that Tranum acted with indifference as to whether
Broadway would be injured and thus acted with malice when he procured criminal proceedings against
Broadway.  See Ruth, 982 S.W.2d at 590.

Conclusion

The evidence at trial “rises
to a level that would enable reasonable and fair-minded people to differ in
their conclusions.”  Merrell Dow
Pharms., Inc. v. Havner, 953 S.W.2d 706, 711 (Tex. 1997).  From this evidence
reasonable jurors could draw a reasonable and logical inference that Tranum
maliciously prosecuted Broadway.  Crediting all favorable evidence that
reasonable jurors could believe and disregarding all contrary evidence except
that which they could not ignore, we conclude that the evidence is legally
sufficient to support the jury’s finding that Tranum maliciously prosecuted
Broadway.  See City of
Keller, 168 S.W.3d at
830.

Viewing all the evidence in a neutral
light, we also find that it is factually sufficient to support the jury’s
finding.  Reasonable jurors could disbelieve Tranum’s evidence that he did not
maliciously prosecute Broadway.  Thus, we cannot say that
the finding is so contrary to the overwhelming weight of the evidence that it
is clearly wrong and unjust.  See Maritime
Overseas Corp. v. Ellis, 971 S.W.2d 402, 407 (Tex. 1998).  Although there were
conflicts in the evidence, we will not substitute our
judgment for that of the jury’s.  See Jackson, 116 S.W.3d at 761. 

Slander








Slander constitutes a “defamatory
statement that is orally communicated or published to a third person without
legal excuse.”  Randall’s
Food Mkts. v. Johnson,
891 S.W.2d 640, 646 (Tex. 1995).  A statement may be slander per se, injurious in itself, or
slander per quod.  Moore
v. Waldrop, 166
S.W.3d 380, 384 (Tex. App.—Waco 2005, no pet.).  Truth is a defense to slander.  See
Randall’s, 891 S.W.2d at 646.

Roger Starcher, a former Tranum
employee, testified by deposition that Tranum held a meeting after Broadway
resigned.  Starcher did not attend the meeting, but heard from an unknown party
that Tranum was “very unhappy” with Broadway and that Broadway “had done some
things that he was going to be going to jail for.”  Tranum told Farmer that
Broadway was “gone” and a “thief, crook, something to that effect.”  Lynn
Barnett, owner of an auto salvage business, testified that Tranum told her that
his business had failed because Broadway had stolen or embezzled money from
him.  Tranum told Sartor that Broadway was a “thief” and had stolen money. 
Tranum “apologized for him [Broadway] ever being a part of the Chamber, ever
volunteering, ever representing his company, and just apologized.”  Ralston was present for part of a meeting, wherein
Tranum stated that Broadway was no longer employed with Tranum Ford and that
there would be a management change, but he did not accuse Broadway of stealing
money or state that he planned to ensure that Broadway went to jail.

Tranum denied calling Broadway a
“thief” or accusing him of stealing or embezzling money.  He testified that
anyone who stated otherwise is “mistaken.”  Tranum specifically denied making
the statements testified to by Sartor, Barnett, and Farmer.  He explained that his
purpose for visiting Sartor was to ensure that the dealership had no further
commitments to the chamber.  Tranum admitted that he may have said that Broadway
was no longer employed by the dealership and that an audit was going to be
performed because some money was missing, but he made sure that no one thought
he was accusing Broadway of any wrongdoing.  Only after he received Niemeier’s
report did Tranum disclose the fact that money had been misappropriated.  

Based on Niemeier’s report and Shaw’s
written statement, Tranum argues that his statements were substantially true.[4]  We disagree.  In light of evidence
that Broadway acted with Tranum’s knowledge or instruction, the jury could
reasonably conclude that Tranum’s statements were not substantially true.

Moreover, because Tranum’s statements accused Broadway of committing
crimes, theft and embezzlement, and injured Broadway in his profession, the record contains evidence that Tranum’s statements
were slanderous per se.  See Moore,
166 S.W.3d at 384 (accusing someone of committing a crime constitutes slander per
se); see also Morrill v. Cisek, 226 S.W.3d 545, 550 (Tex.
App.—Houston [1st Dist.] 2006, no pet.) (citing Bradbury v. Scott, 788 S.W.2d 31, 38-39 (Tex. App.—Houston
[1st Dist.] 1990, writ denied) (“To charge an employee with
dishonesty in his dealings with his employer is slanderous per se in that it
falls within the general classification of ‘words that affect a
person injuriously in his profession or occupation’”)); Bennett v. Computer Assocs. Int'l, 932 S.W.2d 197, 200 (Tex. App.—Amarillo
1996, writ denied) (“One who falsely
imputes to another the crime of theft commits slander per se”).  Accordingly, we hold that the evidence is legally and
factually sufficient to support the jury’s finding that Tranum slandered
Broadway.  See Havner, 953 S.W.2d at 711; see also City of
Keller, 168 S.W.3d at
830; Ellis, 971 S.W.2d at 407.  


Mental Anguish Damages

To recover mental anguish damages, a plaintiff
must produce: (1) “direct evidence of the nature, duration, or severity of
[plaintiffs’] anguish, thus establishing a substantial disruption in the plaintiffs’
daily routine;” or (2) other evidence of “a high degree of mental pain and
distress that is more than mere worry, anxiety, vexation, embarrassment, or
 anger.”  Parkway Co. v. Woodruff, 901 S.W.2d 434,
444 (Tex. 1995).  “Not
only must there be evidence of the existence of compensable mental anguish,
there must also be some evidence to justify the amount awarded.”  Saenz v. Fid. & Guar. Ins. Underwriters, 925 S.W.2d 607, 614 (Tex. 1996).  The jury “cannot simply pick a number and put it
in the blank.”  Id.  “There must be evidence that the amount found is fair
and reasonable compensation.”  Id.

Evidence of Mental Anguish for Malicious
Prosecution

Broadway testified that he had suffered “mental
strain,” worried “about it every day,” was subjected to “a grand jury investigation,” and received
harassing calls from creditors.  He was “scared to death” to testify before the
grand jury but chose to do so because “I wanted to protect my name,” it’s “all
I’ve got left,” and “I didn’t do anything wrong.”  He has been divorced a total
of four times and blames the situation with Tranum for two of these divorces, one
of which took place after he resigned from Tranum Ford.  He “became withdrawn
and distant,” trying to cope and “sustain a life to support a family and pay
bills, just the day-to-day pressures.”  He did not see a psychiatrist or
psychologist, but spoke to his family doctor, something with which he did not
feel comfortable.  He was offered antidepressants but refused.

He noted the difficulty of having
“been in business for seven years in a community and you see people in the
community that know, well, that’s the guy that ran the Ford house that stole
all the money, I mean, you walk into the restaurant and you see them look up
and it’s kind of like…”  He wonders “how people still think about it,” “[h]ow
they still think about me,” “what they still think about me,” and “[w]hether I
should stay here or just pack up and move off.”

Broadway has been continuously
employed in the automobile industry since he resigned.  Two weeks after
resigning, he became the new car sales manager at a dealership in Killeen.  He secured this job before any rumors had spread.  When he returned to
Gatesville about a year later, rumors had begun circulating and he was unable
to secure a manager’s position.  He secured a sales position with another
dealership and approximately one year later assumed the position of used car
manager, a “mid-management position.”  He unsuccessfully applied for other management
positions at different dealerships.  He was unable to procure employment with
anyone who did not know him from the past, and no one familiar with his past
would return his calls.  At some point, he was approached and offered the
position of finance manager for a used car lot in Waco.  He was in this
position at the time of trial.  He has re-mortgaged his home and sold his last
piece of property, other than his home, to pay a bank debt.  He does not own a
car.  He testified that it has taken him five years to get to this point.

In reliance on Woodruff, Saenz, and Burleson
State Bank v. Plunkett, 27 S.W.3d
605 (Tex. App.—Waco 2000, pet. denied), Tranum argues that Broadway’s testimony is insufficient to
establish mental anguish.  Arguing
that his testimony is sufficient, Broadway relies on Houston Livestock Show
& Rodeo, Inc. v. Hamrick, 125 S.W.3d 555 (Tex. App.—Austin 2003,
no pet.) and Valley Nissan, Inc. v. Davila, 133 S.W.3d
702 (Tex. App.—Corpus Christi 2003, no pet.).

In Woodruff, testimony that “I was hot,” “I was very disturbed,” “it changed our life style,” “It’s just
not pleasant,” “It was just upsetting,” “I was just upset,” and it “caused some
friction between us” amounted to mere expressions of “anger, frustration, or
vexation.”  Woodruff, 901
S.W.2d at 445.  The testimony “cite[s]
the existence of ‘mere emotions’: ‘I was hot,’ ‘It was just upsetting,’ and ‘I
was just upset’” and fails to “support the conclusion that the Woodruffs
suffered compensable mental anguish.”  Id.

            In Saenz, statements that “I
was worried,” “I was worried also
that we were going to lose our house,” and “we couldn’t afford the medical
bills” failed to establish mental anguish.  Saenz, 925 S.W.2d at 614.  The plaintiffs “proved worry, anxiety, vexation and anger, but
failed to prove that their distress involved more than these emotions.”  Id.

            In Plunkett, we found Byron Moss’ testimony that “he was unable to sleep,”
 “he suffered from headaches, diarrhea, vomiting, and depression,” “the strain
had affected his work,” and “he had not been able to build any more houses
since this incident” sufficient to support a finding that Byron suffered
“‘a high degree of mental pain and distress’ which caused a serious
disruption in his daily routine.”  Plunkett, 27 S.W.3d at 617.  The evidence “addresses the nature and severity of the mental pain
and distress Byron suffered over an extended period.”  Id. at 618.

In Hamrick, three Livestock Show
participants and their parents provided testimony establishing the mental
anguish they suffered as a result of being disqualified by the Livestock Show. 
See Hamrick, 125 S.W.3d at 564-65.  Each plaintiff testified as to their physical
and emotional symptoms.  Id. at 579-80.  The Austin Court found
“legally and factually sufficient evidence of compensable mental anguish.”  Id. at 580.

            In Davila, Jessica Davila
testified that, “They humiliated me
in front of their employees and threatened to call the cops if we left with the
truck and kind of rushed us to hurry up and get our stuff out and watched us do
it,” “They used vulgar language towards Mr. Rodriguez and I,” and she “had no
way to get home, and had to call someone.”  Davila, 133 S.W.3d at 716.  The Corpus Christi Court found that the “public humiliation of
having one’s truck repossessed” supported mental anguish.  Id.

            In light of the above cases, we cannot say that Broadway provided sufficient evidence of the nature,
duration, or severity of mental anguish.  See Woodruff, 901 S.W.2d at 444.  His
evidence does not rise to the level of establishing a substantial disruption in his daily routine or “a
high degree of mental pain and distress” necessary
for compensable mental anguish.  Id.  For this reason, the evidence is legally
insufficient to support the jury’s finding that Broadway suffered mental
anguish damages as a result of Tranum’s malicious prosecution, and the jury’s
award of $500,000 in mental anguish damages for malicious prosecution cannot
stand.  See Saenz, 925 S.W.2d at 614.

Evidence of Mental
Anguish for Slander

Because Tranum’s statements were slanderous per
se, Broadway was not required to present “independent proof” of mental anguish, “as
the slander itself gives rise to a presumption of these damages.”  Moore,
166 S.W.3d at 384 (citing Mustang Athletic Corp. v. Monroe, 137 S.W.3d 336, 339 (Tex. App.—Beaumont
2004, no pet.)).  “The amount of damages in a defamation case is
peculiarly within the province of the fact-finder, and an appellate court will
not disturb the verdict or award unless it appears from the record to be
excessive or the result of passion, prejudice, or other improper influences.”  Morrill,
226 S.W.3d at 550.

The record in this case does not indicate that the
jury’s award of past mental anguish
damages in the amount of $250,000 is either
excessive or the result of passion, prejudice, or other improper influence.  The
amount was within the jury’s discretion and we will not substitute our judgment for that of the jury even
if we might have reached a different result.  See Peshak v. Greer, 13 S.W.3d 421, 427 (Tex. App.—Corpus Christi 2000, no pet.) (“amount of general damages is very difficult to
determine, and the jury is given wide discretion in its estimation of them”); see
also Checker Bag, 27 S.W.3d at 633; Jackson, 116 S.W.3d at 761.  The evidence is
legally and factually sufficient to support the jury’s award of $250,000 in
mental anguish damages for slander. [5]

Reputation Damages

In a malicious prosecution action, a
person may recover damage to his reputation “resulting from the accusation brought against him.”  Restatement (Second) of Torts § 670
(1977); see Eans v. Grocer
Supply Co., 580 S.W.2d 17, 22
(Tex. Civ. App.—Houston [1st Dist.] 1979, no writ); see also Thrift, 974
S.W.2d at 80-81 (affirming award of reputation damages for malicious
prosecution). 

The jury awarded Broadway $75,000 in
reputation damages for malicious prosecution.  Tranum argues that Broadway’s
reputation was not damaged because (1) witnesses testified that Tranum’s
statements did not change their opinions of Broadway; and (2) he failed to
present evidence that “anyone ever turned him down for a position because of
any alleged statement regarding his departure from Tranum Ford.”  Both
arguments address whether Tranum’s statements damaged Broadway’s
reputation.  The jury did not award reputation damages for slander.  That Tranum’s
statements may have damaged Broadway’s reputation is irrelevant to our determination
of whether the jury properly awarded reputation damages for malicious
prosecution.

Tranum further contends that Broadway failed
to offer evidence that he “suffered financially or mentally from damage to his
reputation” or received a “reduction in wages or lost profits.”  He relies on
the fact that Broadway was able to secure employment two weeks after resigning
from Tranum Ford and eventually secured a higher salary.  We do not find these
arguments dispositive.  Broadway admitted that he has been continuously employed
in the automobile industry but testified that his efforts to obtain higher
management positions have failed.  He was unable to obtain employment with
anyone who did not know him from the past.  Tranum did not refute this
testimony.

As a result of Tranum’s malicious
prosecution, Broadway was charged with committing the crime of theft.  The jury
could reasonably conclude that his reputation was subsequently damaged and that
$75,000 is a reasonable amount to compensate for this damage.  See Thrift,
974 S.W.2d at 80-81 ($275,000 in reputation damages for malicious
prosecution “reasonable in
light of the gross social stigma attached to criminal charges that Hubbard
will be burdened with both professionally and socially as long as the
indictment remains on her record”).  The evidence is legally and factually
sufficient to support the jury’s award of damages for injury to Broadway’s
reputation.

Exemplary Damages

Exemplary
damages must be established by clear and convincing evidence;
thus, an elevated standard of review applies.  Sw. Bell Tel. Co. v. Garza, 164 S.W.3d 607, 627 (Tex. 2004).
 Under legal sufficiency review, when a jury makes an affirmative finding of
malice, we review all the evidence in the light most favorable to the jury’s
finding, taking into account contrary undisputed facts, to determine whether
reasonable jurors could have formed a firm belief or conviction regarding
malice.  Qwest Int'l Commc’n, Inc. v.
AT&T Corp.,
167 S.W.3d 324, 326 (Tex. 2005); see also Garza, 164 S.W.3d at 627; In re J.F.C., 96 S.W.3d 256, 266 (Tex. 2002).  Under factual sufficiency review, we give due consideration
to any evidence the factfinder could reasonably have found to be clear and
convincing.  J.F.C., 96 S.W.3d at 266.  We
must consider the disputed evidence and determine whether a reasonable factfinder
could have resolved that evidence in favor of the finding.  Id.  The
evidence is factually insufficient if, in light of the entire record, the
disputed evidence that a reasonable factfinder could not have credited in favor
of its finding is so significant that a factfinder could not have reasonably
formed a firm conviction or belief.  Id.

Malice

            For exemplary damages, malice
constitutes: (1) a specific
intent by the defendant to cause substantial injury or harm to the
claimant; or (2) an act or omission: 

(i)
which when viewed objectively from the standpoint of the actor at the time of
its occurrence involves an extreme degree of risk, considering the probability
and magnitude of the potential harm to others; and 

(ii) of which the actor has actual, subjective awareness of the risk involved,
but nevertheless proceeds with conscious indifference to the rights, safety, or
welfare of others.

 

Act of April 20, 1995, 74th Leg., R.S., ch. 19, § 1,
1995 Tex. Gen. Laws 108, 109 (amended 2003) (current version at Tex.
Civ. Prac. & Rem. Code Ann. § 41.003 (Vernon Supp. 2007)).[6]

            Tranum argues that he did not act with
malice because the jury found that (1) Broadway breached his fiduciary duty to
Tranum Ford; (2) Tranum had probable cause to bring the case to Simpson; (3)
Tranum’s statements about Broadway were substantially true; and (4) Tranum
acted within his rights when he submitted the case to Simpson and disclosed
Broadway’s actions to others.  He further contends that Broadway suffered no
harm as a result of Tranum’s actions and that Broadway, having breached his
fiduciary duty to Tranum Ford, had “unclean hands.”

However, the record contains sufficient evidence
by which the jury could determine that Tranum acted with a “specific intent” to cause Broadway “substantial injury
or harm.”  Tranum made statements accusing Broadway of theft and embezzlement. 
He told Farmer that he wanted to “get” Broadway and “prosecute” him.  Sartor
was under the impression that Tranum wanted to “hurt” Broadway.  Broadway himself
had heard that Tranum wanted to turn him over to the
police, ruin his credit, and send him into bankruptcy.  The truth of whether
Broadway had committed the criminal acts with which he was accused was uniquely
within Tranum’s knowledge.  Yet, he proceeded to spread these accusations among
members of the very community wherein Broadway lived and worked, including the district attorney and
those associated with the automobile industry.  The jury could have “formed a firm belief or conviction” that
Tranum acted with malice.  See Qwest, 167 S.W.3d at 326; see
also J.F.C., 96 S.W.3d at 266.

 

 

Amount of Exemplary Damages

The jury found that Tranum acted with malice and
awarded a total of $825,000 in actual damages and $750,000 in exemplary
damages.  In addition to challenging the legal and factual sufficiency of the
exemplary damages award, Tranum presents several other issues addressing the
amount of exemplary damages: (1) the award is unconstitutional (issue two); (2)
the trial court failed to tie exemplary damages to a cause of action (issue
three); and (3) we should remit the amount of exemplary damages in the event we
strike or reduce the award of mental anguish damages (issue five).  

We begin with Tranum’s third issue, wherein he
argues that because the trial court submitted a single question inquiring as to
the amount of exemplary damages, we cannot ascertain whether the award is based
on malicious prosecution, slander, or
both.  See Cathey
v. Meyer, 115 S.W.3d 644, 666-67
(Tex. App.—Waco 2003), rev’d in part on other grounds, 167 S.W.3d 327 (Tex. 2005) (per curiam); see also San Antonio Credit Union v. O’Connor, 115 S.W.3d 82, 102-03 (Tex. App.—San Antonio 2003, pet. denied).[7] 
However, after reducing the amount of mental anguish damages, we must
automatically reevaluate the exemplary damages award to determine whether the
award is excessive.  See Bunton v. Bentley, 153 S.W.3d 50, 51, 54 (Tex. 2004).

In doing so, we need not reach the issue of
whether the $750,000 exemplary damages award is unconstitutionally
excessive, as it is excessive under section 41.008(b) of the Civil Practice
& Remedies Code.  Section 41.008(b) provides that exemplary damages “may
not exceed an amount equal to the greater of…two times the amount of economic
damages; plus…an amount equal to any
noneconomic damages found by the jury, not to exceed $ 750,000.”  Tex. Civ. Prac. & Rem. Code Ann. §
41.008(b)(1)(A)-(B) (Vernon Supp. 2007).

In Shell
Oil Prods. Co. v. Main St. Ventures,
90 S.W.3d 375 (Tex. App.—Dallas 2002, pet. dism’d by agr.), the Dallas Court “reversed a substantial portion
of the actual damages awarded by the jury.”  Id. at 386.  Shell argued
that this reversal required the appellate court to “remand the cause to the
trial court ‘for reconsideration of the punitive damage award.’”  Id.  Citing section 41.008, the Dallas Court noted that “the exemplary damage award
is currently more than two times the amount of the actual damages that we have
affirmed.”  Id.  Declining to remand the case, the Dallas Court reformed
the punitive damages award to an amount two times the amount of affirmed actual
damages.  See id. (citing Gunn Infiniti, Inc., v. O'Byrne, 996 S.W.2d 854, 861 (Tex. 1999)
(after mental anguish damages were reversed, DTPA damages were reformed to satisfy
statutory limits)).  We believe that this is the proper procedure to
follow in the present case.  


Here, no economic damages were awarded; exemplary
damages may not exceed an amount equal to the amount of non-economic damages, i.e.
$325,000.  See Tex. Civ. Prac.
& Rem. Code Ann. § 41.008(b)(1)(B).  Accordingly, we modify the
judgment to award $325,000 in exemplary damages.  See Shell Oil,
90 S.W.3d at 386.  We need not address Tranum’s second and fifth issues.  See
Tex. R. App. P. 47.1.

 

EXPERT TESTIMONY

            In his seventh issue, Tranum contends
that the trial court improperly excluded Niemeier’s expert testimony.  Three days before trial, Tranum filed his first response to
Broadway’s request for disclosures, designating Niemeier as an expert witness.  Broadway
moved to exclude Niemeier’s expert testimony.  Tranum admitted that his response
was not timely.  Concluding that Niemeier was not timely designated as an
expert witness, the trial court allowed Niemeier to be called solely as a fact
witness. 

An expert witness who is not timely identified
during discovery will not be permitted to testify unless the court finds good
cause for the proponent’s failure to timely identify the expert or finds that
the opposing party is not unfairly surprised or prejudiced by the expert’s
testimony.  In re Toyota Motor
Corp., 191 S.W.3d 498, 501 (Tex. App.—Waco 2006, no pet.); see Tex. R. Civ. P. 193.6.  We review a trial court’s exclusion of expert testimony for
abuse of discretion.  K-Mart Corp. v. Honeycutt, 24 S.W.3d 357, 360 (Tex. 2000).

Tranum contends that Broadway could
not have been unfairly surprised or prejudiced by the untimely designation of
Niemeier as an expert because he received a copy of Niemeier’s report several
years before trial and should have known that Tranum would rely on the
accounting firm for expert testimony.[8] 
We addressed a similar argument in Barr
v. AAA Tex., LLC, wherein the
Barrs identified Jerry Condra as a person with knowledge of relevant facts, but
at trial, called Condra as an expert.  See 167 S.W.3d 32, 36 (Tex. App.—Waco 2005, no pet.).  The trial court excluded the testimony.  Id.  On appeal, the Barrs contended that “AAA was not surprised or prejudiced
because their disclosure to AAA of Condra’s invoices and the correspondence
regarding the Barrs’ dispute with Condra over the amount they would pay him
gave AAA sufficient notice that Condra had knowledge regarding the reasonableness
and necessity of the charges.”  Id. at 37.  We construed this as a “contention
that AAA should have anticipated that the Barrs would call Condra to establish this
element of their claim” and held that “‘the rules were revised to make that
sort of anticipation unnecessary.’”  Id.  (quoting Ersek v. Davis & Davis, P.C., 69 S.W.3d 268, 272 (Tex. App.—Austin
2002, pet. denied)); see also Alvarado v. Farah Mfg. Co., 830 S.W.2d 911, 915 (Tex. 1992)
(“A party is entitled to prepare for trial assured that a witness will not be
called because opposing counsel has not identified him or her in response to a
proper interrogatory”).  That Broadway was aware of Niemeier’s report and may
have been aware that Niemeier might be called as an expert witness does not
negate unfair surprise or prejudice.

Tranum asserts numerous other
arguments to support his position that Broadway was not unfairly surprised or
prejudiced.  First, he relies on his identification of the report and the
accounting firm in his interrogatory response.  This response merely identifies
employees of the accounting firm as persons with whom Tranum had conversations
regarding any “improper conduct and illegal conduct” by Broadway and identifies
the accounting firm as a consulting expert.  It fails to identify any
potential testifying experts.

Second, he argues that Broadway’s
motion was based on the “gate-keeper criteria” of Rules of Evidence 702, 703,
and 705, yet the trial court excluded Niemeier’s expert testimony on the basis
that he was untimely designated.  He places some emphasis on the fact that
Broadway challenged the timeliness of Tranum’s response only after arguing that
documents supporting Niemeier’s conclusions were not produced and Niemeier’s
testimony did not comply with “gate-keeper criteria.”  The order of Broadway’s
arguments is not evidence of a lack of surprise or prejudice.         

Finally, Tranum argues that a failure
to timely designate experts as opposed to a complete failure to
identify experts indicates a lack of surprise or prejudice.  Rule 193 does not
contemplate such a distinction.  See Tex.
R. Civ. P. 193.6 (one “who
fails to make, amend, or supplement a discovery response in a timely manner
may not introduce in evidence the material or information that was not timely
disclosed”) (emphasis added).  He further argues that
Broadway deliberately took no action to compel because he knew that the answer
would identify Niemeier.  The record is silent as to counsel’s reasons for
failing to compel Tranum’s responses to disclosure and we will not so speculate.

In summary, we cannot say that the
trial court abused its discretion by excluding Niemeier’s expert testimony.  See
Honeycutt, 24 S.W.3d at 360. 
We overrule Tranum’s seventh issue.

Conclusion

Because the evidence is legally insufficient to
support the award of mental anguish damages for malicious prosecution, we
modify the judgment to delete that award.  In light of our reduction in the
amount of actual damages, we modify the judgment to reduce the exemplary
damages award from $750,000 to $325,000.  The judgment is affirmed as modified.

 

 

FELIPE REYNA

Justice

Before Chief
Justice Gray,

Justice Vance, and

Justice Reyna

(Chief Justice Gray concurs in the judgment of the Court.  A
separate opinion will not issue.)

(Justice Vance dissenting)

Affirmed as
modified 

Opinion
delivered and filed July 2, 2008

[CV06]









[1]               Broadway also alleged that Tranum
defrauded the corporation and its shareholders.

 





[2]               The jury also found that Tranum did
not convert property of Tranum Ford but breached his fiduciary duty to Tranum
Ford, causing no damages.

 





[3]               The theft charge appears to be based on Broadway’s receipt of $82,091
in bonuses as a result of altering financial statements, rather than his use of
company funds to pay personal expenses.  In
Beals’s memorandum, he concluded that Broadway committed “theft by deception:”

 

Specifically, Broadway intentionally
misrepresented the amount of annual net profit of Tranum Ford-Mercury in order
to obtain a yearly bonus, thereby unlawful[ly] appropriating funds (property)
from Tranum.  These bonuses totaled more than $20,000 but less than $100,000.

 

Beals further noted that, during his interview with Niemeier and a
discussion as to personal expenses, “Niemeier cautioned that consideration
should be given to determine if Mr. Tranum made the same kinds or types of
expenditures and listed them as business expenses also.”  Accordingly, we will
focus our analysis on Broadway’s receipt of bonuses rather than payment of
personal expenses.   





[4]               Tranum
again asserts that the jury’s slander finding conflicts with its finding that
Broadway committed a breach of fiduciary duty and argues that “a new trial is
warranted on this basis alone.”  Tranum cites no authority for this proposition
and has failed to preserve this issue for appeal.  See Kennedy
Ship & Repair, L.P. v. Pham, 210 S.W.3d 11, 24 (Tex. App.—Houston [14th Dist.] 2006, no pet.).





[5]               In his fourth issue, Tranum contends that Broadway
received a double recovery of mental anguish damages because the mental anguish
supporting the awards for both slander and malicious prosecution are the same. 
We decline to address this issue in light of our determination that the
evidence is legally insufficient to support mental anguish damages for
malicious prosecution.  For this same
reason, we need not address Tranum’s sixth issue
asking us to remit the mental anguish award.





[6]               Because this case was filed before
September 1, 2003, we apply the law in effect at that time.  See Dillard Dep’t Stores, Inc. v. Silva, 148 S.W.3d 370, 373 (Tex. 2004).





[7]
              Tranum did not object to the
trial court’s charge on exemplary damages.  See Green Intl., Inc. v. Solis, 951 S.W.2d 384, 389-390 (Tex.
1997); see also Barnett v. Coppell N. Tex. Court, Ltd., 123 S.W.3d 804, 826 (Tex. App.—Dallas 2003, pet.
denied).  





[8]               Broadway argues that Tranum failed
to preserve this issue for appeal.  However, the record indicates that Tranum made
his position known to the trial court and the trial court made a ruling.  See
Tex. R. App.
P. 33.1.